UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



DAVID D. ADAMS,
Plaintiff,

v.

TRANSUNION LLC;
EXPERIAN INFORMATION SOLUTIONS, INC.;
EQUIFAX INFORMATION SERVICES LLC;
LVNV FUNDING LLC;
SELF FINANCIAL, INC.; and
REGIONAL ACCEPTANCE CORPORATION,

Defendants.

Case No. 1:25-cv-00410-JLS-HKS

SECOND AMENDED COMPLAINT

Plaintiff David D. Adams, proceeding pro se, alleges as follows:

# I. NATURE OF THE ACTION

1. This is an action for willful and negligent violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*; and New York General Business Law § 349.

2. This case arises from years of inaccurate, misleading, contradictory, re-aged, and unverifiable credit reporting; repeated failures to conduct reasonable reinvestigations after disputes; continued furnishing and re-verification of disputed information; and collection-related conduct despite written disputes and formal notice.

3. Although Credit Acceptance Corporation ("CAC") is not named as a defendant herein because Plaintiff's claims against CAC are currently proceeding in arbitration, the conduct of TransUnion, Experian, and Equifax in handling the CAC tradeline is directly

relevant and independently actionable here. Plaintiff's claims against those bureaus are based on their own conduct in receiving disputes, failing to reinvestigate, continuing publication, and repeatedly re-verifying the disputed CAC account.

4. **The CAC dispute concerns objectively verifiable factual matters, not complex legal questions.** Plaintiff's dispute regarding the Credit Acceptance Corporation tradeline concerns the objectively verifiable status and accuracy of the account, including whether the balance remained owed and whether continued delinquencies were being reported after the obligation was extinguished through insurance proceeds following a 2019 total-loss event.

5. The CAC tradeline was inaccurate because the underlying auto obligation had been satisfied and/or extinguished following a 2019 total-loss event and related insurance and GAP payments, yet the CRA Defendants continued to report CAC as an active, presently delinquent obligation accruing new missed payments each month.

6. This dispute does not require resolution of a complex legal question, but instead involves straightforward factual inaccuracies capable of verification through reasonable investigation.

7. Over a period exceeding six years, Defendants' conduct caused Plaintiff credit exclusion, denial of financing, increased borrowing costs, employment limitations, loss of favorable mortgage opportunities, housing and neighborhood harms, reputational harm, emotional distress, financial hardship, and foreseeable aggravation of Plaintiff's documented physical injuries.

8. **Plaintiff's consumer reports containing the inaccurate and derogatory information described herein were disclosed to third parties, including lenders, creditors, insurers, and housing providers.**

9. **These third parties relied upon such information in making adverse determinations, including denials of credit, less favorable lending terms, higher insurance costs, increased security deposit requirements, and reduced housing opportunities.**

10. **The harms described herein are concrete, non-speculative, and constitute actual injuries directly resulting from Defendants' reporting and reinvestigation failures.**

# II. JURISDICTION AND VENUE

11. This Court has federal question jurisdiction under 28 U.S.C. § 1331.
12. This Court has jurisdiction over Plaintiff's FCRA claims under 15 U.S.C. § 1681p.
13. This Court has jurisdiction over Plaintiff's FDCPA claims under 15 U.S.C. § 1692k(d).
14. This Court has supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367.
15. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff resides in this District and a substantial part of the events giving rise to these claims occurred in this District.

# III. PARTIES

16. Plaintiff David D. Adams is a natural person residing in Buffalo, New York, and is a "consumer" within the meaning of 15 U.S.C. § 1681a(c).
17. Defendant TransUnion LLC is a "consumer reporting agency" within the meaning of 15 U.S.C. § 1681a(f).
18. Defendant Experian Information Solutions, Inc. is a "consumer reporting agency" within the meaning of 15 U.S.C. § 1681a(f).
19. Defendant Equifax Information Services LLC is a "consumer reporting agency" within the meaning of 15 U.S.C. § 1681a(f).
20. Defendant LVNV Funding LLC is a debt buyer, debt collector, and furnisher of information.
21. Defendant Self Financial, Inc. is a furnisher of information and a consumer-financial-services company involved in the issuance, servicing, reporting, and collection of a secured credit-card product.
22. Defendant Regional Acceptance Corporation ("RAC") is a furnisher of information to consumer reporting agencies.

# IV. COMMON FACTUAL ALLEGATIONS

23. Plaintiff has repeatedly disputed inaccurate, misleading, and/or unverifiable tradelines and account information on his credit reports.

24. Those disputes were sent both to furnishers and to the consumer reporting agencies.

25. Plaintiff's disputes identified inaccurate balances, improper late-payment reporting, improper charge-off reporting, unverifiable debt information, re-aging, continued publication of disputed information, and failures to delete unverifiable tradelines.

26. Beginning in late 2019, immediately after Plaintiff realized that the CAC tradeline was still appearing on his credit reports, Plaintiff began disputing that tradeline with TransUnion, Experian, and Equifax.

27. By March 2020, Plaintiff had already sent four rounds of disputes regarding the CAC tradeline, approximately one every thirty days.

28. After those four rounds of disputes, Plaintiff filed a CFPB complaint against all three bureaus regarding the CAC account.

29. Despite that extensive notice, all three bureaus continued reporting CAC as still active and continued reflecting a new missed payment monthly for years.

30. Plaintiff alleges that this monthly recurring reporting did not merely preserve historical data but republished CAC as a fresh, ongoing delinquency each month, thereby worsening the tradeline's impact and making it appear continuously active and unresolved.

31. This reporting occurred on a monthly, recurring basis over a period exceeding six years, continuously refreshing the derogatory impact of the tradelines on Plaintiff's credit profile.

32. **Experian ceased reporting the CAC tradeline sometime after July 2025.**

33. **Equifax ceased reporting the CAC tradeline sometime after December 2025.**

34. **TransUnion, however, has continued to report the CAC tradeline beyond December 2025 and after the commencement of this lawsuit, making TransUnion the lone holdout among the three major bureaus.**

35. **TransUnion has reported 68 consecutive months of new delinquencies on the CAC account despite being on notice since late 2019 of the 2019 total-loss event and insurance-related satisfaction or extinguishment of the obligation.**

36. **Upon information and belief, two nationwide consumer reporting agencies ceased reporting the CAC tradeline after reinvestigation, while TransUnion continued reporting the same disputed information as an active, monthly worsening delinquency.**

37. **The fact that Experian and Equifax have ceased reporting CAC while TransUnion persists demonstrates that TransUnion's "investigation" procedures are either non-existent or a sham, and that TransUnion's willful continuation is uniquely egregious.**

38. Plaintiff has also disputed the RAC, Self, and LVNV tradelines through written disputes, validation demands, CFPB complaint activity, CRA disputes, and related correspondence.

39. Despite repeated notice, Defendants continued reporting, verifying, re-verifying, or failing to correct disputed information.

# V. DEFENDANT-SPECIFIC FACTUAL ALLEGATIONS

## A. TransUnion LLC

40. TransUnion received Plaintiff's disputes regarding CAC beginning in late 2019.

41. By March 2020, TransUnion had already received four rounds of disputes concerning CAC.

42. After those dispute rounds, Plaintiff filed a CFPB complaint against the bureaus concerning CAC.

43. Despite that notice, TransUnion continued publishing the CAC tradeline as derogatory and active, with new monthly missed-payment notations.

44. The CAC obligation had been satisfied and/or extinguished following the 2019 total-loss event and related insurance and GAP payments, yet TransUnion continued to report it as a presently active delinquent auto obligation.

45. TransUnion's CAC reporting was therefore inaccurate and materially misleading because it stated or implied that Plaintiff remained in an ongoing current delinquency on a live obligation that no longer existed.

46. **TransUnion has reported the CAC tradeline with 68 consecutive months of new missed payments, treating each month as a fresh delinquency, despite being on notice since late 2019 that the underlying obligation was extinguished in 2019.**

47. **While Experian ceased reporting CAC after July 2025 and Equifax ceased reporting CAC after December 2025, TransUnion has persisted in reporting the CAC account beyond December 2025 and after the commencement of this lawsuit.**

48. **TransUnion is the lone holdout among the three major bureaus in continuing to report the CAC tradeline, demonstrating that its procedures are uniquely flawed, that its reinvestigations are shams, and that its conduct is willful.**

49. **The fact that Experian and Equifax ultimately ceased reporting the CAC tradeline after reinvestigation while TransUnion alone continued reporting it as an active, monthly worsening delinquency demonstrates that TransUnion's procedures and reinvestigations were uniquely deficient and objectively unreasonable.**

50. **TransUnion's post-litigation continuation of CAC reporting after Experian and Equifax corrected or ceased their reporting proves that TransUnion consciously disregarded its statutory duties and acted in reckless disregard of Plaintiff's rights.**

51. TransUnion also failed to conduct a reasonable reinvestigation of Plaintiff's disputes regarding RAC.

52. RAC's reporting contained facial contradictions and materially misleading combinations of data, including a reported balance of approximately $21,114 together with a reported charge-off amount of approximately $17,889, full-balance "past due" treatment after charge-off, and repeated charge-off coding into 2025 and 2026.

53. TransUnion failed to correct RAC despite the fact that the reporting, on its face, was incoherent: if the account had already

been charged off in one stated amount, RAC could not simultaneously portray a larger present delinquent balance in a manner that made the account appear newly and actively worse without clearly explaining any lawful basis for that difference.

54. TransUnion also failed to reasonably reinvestigate Self after Plaintiff disputed Self's reporting as inaccurate, unverifiable, and materially misleading, including over-1000% utilization on a $300 secured card, balance increase after charge-off, re-aging of delinquency, and late payments added after charge-off.

## TransUnion's Procedures Were Unreasonable

55. Upon information and belief, TransUnion maintained and followed automated verification procedures that relied predominantly or exclusively on furnisher responses transmitted via the e-OSCAR system without independent review or analysis of consumer-submitted documentation.

56. Upon information and belief, TransUnion's reinvestigation procedures did not include policies to flag or escalate tradelines for heightened scrutiny when consumers provided documentary evidence contradicting furnisher assertions, even when that evidence included insurance payout documentation, CFPB complaint filings, or litigation notice.

57. Upon information and belief, TransUnion's procedures deferred to furnisher re-verification as conclusive even when the tradeline displayed facial contradictions such as mismatched charge-off amounts and balances, post-charge-off full-balance past-due treatment, and repeated monthly charge-off coding.

58. Upon information and belief, TransUnion maintained policies or practices of treating automated e-OSCAR "verified as accurate" responses as sufficient to close disputes, without manual review of the specific factual contradictions identified by the consumer or the supporting documentation provided.

59. Plaintiff alleges that TransUnion's procedures were unreasonable because they systematically prioritized speed and automation over accuracy when consumers provided specific factual challenges supported by documentation, and because they failed to implement meaningful secondary review or escalation protocols for tradelines displaying obvious internal

inconsistencies or contradicted by consumer-submitted evidence.

60. No reasonable interpretation of 15 U.S.C. § 1681e(b) permits a consumer reporting agency to rely blindly on automated furnisher responses while ignoring consumer-submitted documentary evidence and obvious facial contradictions in tradeline data.

61. TransUnion's reliance on these automated procedures in the face of four dispute rounds, CFPB complaints, litigation notice, and years of continued publication of facially contradictory data demonstrates that its procedures were not designed to assure maximum possible accuracy and constituted objectively unreasonable conduct under the FCRA.

62. **The divergent outcome—where Experian and Equifax ceased reporting CAC but TransUnion persisted—proves that TransUnion's procedures are uniquely inadequate and that TransUnion failed to conduct any meaningful investigation or follow the industry standard set by the other two major bureaus.**

63. TransUnion's conduct was negligent and/or willful.

## B. Experian Information Solutions, Inc.

64. Experian received Plaintiff's disputes regarding CAC beginning in late 2019 and, by March 2020, had already received four rounds of disputes regarding CAC.

65. Plaintiff then filed a CFPB complaint against all three bureaus concerning CAC.

66. Despite that notice, Experian continued publishing CAC as an active derogatory tradeline with recurring monthly missed-payment treatment for years and did not stop reporting CAC until sometime after July 2025.

67. Because the CAC obligation had been satisfied and/or extinguished, Experian's continued reporting of CAC as a live, monthly-worsening delinquency was inaccurate and materially misleading.

68. Experian also failed to conduct a reasonable reinvestigation of Plaintiff's disputes concerning RAC and Self, despite the facial contradictions in RAC's charge-off and balance data and Self's

extreme utilization and post-charge-off balance increase on a $300 secured card.

## Experian's Procedures Were Unreasonable

69. Upon information and belief, Experian maintained and followed automated verification procedures that relied predominantly or exclusively on furnisher responses transmitted via the e-OSCAR system without independent verification of consumer-submitted evidence or escalation when disputes were supported by third-party documentation.

70. Upon information and belief, Experian's procedures did not include policies to conduct heightened review or independent verification when consumers disputed tradelines multiple times, filed CFPB complaints, or provided documentation such as insurance settlement records, accident reports, or dispute correspondence with furnishers.

71. Upon information and belief, Experian's procedures treated automated "verified as accurate" responses from furnishers as dispositive and did not require analysts to review consumer attachments, evaluate internal data contradictions, or apply independent judgment when tradeline data was facially inconsistent.

72. No reasonable interpretation of § 1681e(b) or § 1681i allows Experian to repeatedly "verify" disputed tradelines by parroting furnisher responses while ignoring (a) its own exposure alerts, (b) Plaintiff's documents, and (c) glaring contradictions in the reporting.

## Experian's Aggravating Conduct

73. Beyond the tradeline-specific errors, Experian's misconduct was aggravated by its own knowledge that Plaintiff's personal identifying information had been broadly exposed.

74. Experian's own portal notified Plaintiff that his personal information had been exposed 29 times across data-broker sites and related exposure points.

75. Those Experian-generated exposure notices put Experian on heightened notice that Plaintiff's identity and personal information were at risk, yet Experian still continued "verifying"

disputed derogatories without a reasonable reinvestigation and continued publishing false data.

76. Plaintiff further alleges that Experian engaged in post-suit misconduct, including false missed-payment reporting in May 2025, despite repeated disputes, CFPB complaints, and the pendency of this federal case.

77. Plaintiff also alleges that while Experian was on notice of Plaintiff's broad data exposure and continued verifying disputed inaccuracies, it attempted to market or sell Plaintiff products purportedly designed to protect against the same kinds of identity and credit harms that its own failures were worsening.

78. Plaintiff alleges that this conduct was especially deceptive and aggravating because Experian was simultaneously: (a) informing him that his personal data had been exposed; (b) continuing to publish and verify disputed derogatory information; and (c) attempting to monetize the risk environment through credit/privacy-related protection products.

79. Experian's conduct was negligent and/or willful.

## C. Equifax Information Services LLC

80. Equifax received Plaintiff's disputes regarding CAC beginning in late 2019 and, by March 2020, had already received four rounds of disputes concerning CAC.

81. Plaintiff then filed a CFPB complaint against all three bureaus concerning CAC.

82. Despite that notice, Equifax continued reporting CAC as an active derogatory tradeline with a new missed payment monthly and did not stop reporting CAC until sometime after December 2025.

83. Because CAC had been satisfied and/or extinguished, Equifax's continued portrayal of CAC as a live, monthly-worsening delinquency was inaccurate and materially misleading.

84. Equifax likewise failed to reasonably reinvestigate RAC and Self despite obvious contradictions in RAC's charge-off versus balance figures, its repeated charge-off coding, and Self's extreme utilization, post-charge-off balance increase, and re-aging.

**Equifax's Procedures Were Unreasonable**

85. Upon information and belief, Equifax maintained and followed automated verification procedures that relied predominantly or exclusively on furnisher responses transmitted via the e-OSCAR system without independent substantive review of the disputed data or consumer-submitted supporting documentation.

86. Upon information and belief, Equifax's procedures did not include policies requiring analysts to review and assess consumer attachments, conduct independent verification, or escalate disputes when the consumer provided documentary evidence such as insurance records, regulatory complaints, or correspondence with furnishers.

87. Upon information and belief, Equifax's procedures treated furnisher re-verification responses as conclusive without evaluating whether the tradeline data itself was facially inconsistent, contradictory, or impossible on its face.

88. Equifax's pattern of rubber-stamping furnisher responses and continuing to report plainly inconsistent tradelines was objectively unreasonable and in reckless disregard of its duties under § 1681e(b) and § 1681i.

89. The fact that Equifax eventually stopped reporting CAC in December 2025—years after Plaintiff first disputed it— demonstrates that its initial and repeated "verifications" were not the product of reasonable procedures but rather the result of automated deference to furnisher responses.

90. Equifax's conduct was negligent and/or willful.

## D. Regional Acceptance Corporation

91. RAC furnished inaccurate, contradictory, and materially misleading information about Plaintiff.

92. RAC reported a balance of approximately $21,114 while also reporting a charge-off amount of approximately $17,889.

93. That reporting was inaccurate and misleading because a furnisher cannot coherently report one fixed historical amount as the charge-off and at the same time report a larger present delinquent balance in a way that makes the account appear both charged off and newly delinquent unless it clearly and lawfully explains the difference.

94. RAC also reported the entire balance as "past due" after charge-off, overstating the nature of the delinquency and intensifying the account's negative effect on Plaintiff's credit profile.

95. RAC continued to report repeated monthly "CO" or charge-off coding through 2025 and 2026 even though a charge-off is a historical status event, not a fresh new event every month, thereby re-aging the tradeline and causing the account to appear continuously newly derogatory.

96. RAC's reporting also contained internal inconsistencies concerning account status, highest balance, payment metrics, and summary descriptors across different bureau displays and reporting views, demonstrating that RAC's own data collapsed under internal contradiction.

## RAC Received Notice via CRA Dispute Channels

97. Plaintiff disputed the RAC tradeline directly with TransUnion, Experian, and Equifax on multiple occasions.

98. Upon information and belief, each of those consumer reporting agencies forwarded Plaintiff's disputes to RAC pursuant to 15 U.S.C. § 1681i(a)(2) via the automated dispute system (ACDV/e-OSCAR).

99. Plaintiff alleges that RAC received notice of those disputes from the CRAs, as evidenced by the fact that the CRAs subsequently reported to Plaintiff that RAC had "verified" the tradeline as accurate.

100. RAC therefore received notice of Plaintiff's disputes from consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2(b).

## RAC's Investigation Was Unreasonable

101. Despite receiving notice of dispute from the CRAs, RAC failed to conduct a reasonable investigation of the disputed information.

102. RAC's responses to the CRA dispute notices consisted of automated re-verification without addressing the specific contradictions identified in Plaintiff's disputes, including the mismatch between the charge-off amount and the reported balance, the post-charge-off full-balance past-due treatment, and the repeated monthly charge-off coding.

103. RAC failed to review or provide documentation reconciling the contradictory data fields it was furnishing.

104. RAC failed to modify, delete, or permanently block the reporting of the disputed information despite the fact that its own furnished data was facially contradictory and could not be verified as accurate.

105. RAC violated 15 U.S.C. § 1681s-2(b) and acted negligently and/or willfully.

## E. Self Financial, Inc.

106. Self issued a secured credit-card product tied to a $300 secured limit.

107. Self nonetheless allowed a $1,946.76 Hertz charge to post on February 28, 2022, far beyond the secured limit, and later acknowledged in writing that this charge appeared in the transaction history.

108. By permitting that charge to post and then reporting the resulting debt as derogatory, Self failed to protect the consumer on a secured-card product and later used the resulting balance against Plaintiff.

109. Self later reported or caused to be reported a balance of approximately $3,459 on the charged-off/closed account, reflecting extreme utilization on a secured product, unexplained post-charge-off balance growth, and continued derogatory treatment after dispute and closure.

### Self's CFPB Complaint and Response

110. Plaintiff submitted a CFPB complaint concerning Self on or about May 3, 2025, stating that Self allowed Hertz to charge over $2,000 on a $300-limit secured card, failed to investigate, closed the account, reported it derogatorily, and continued charging late fees and interest as recently as August 2024.

111. The CFPB sent that complaint to Self on or about June 24, 2025, and Self responded on or about July 8, 2025.

112. In its written response, Self admitted that: (a) the secured card was opened on July 8, 2021; (b) the last successful payment posted on March 30, 2023; and (c) a Hertz charge in the amount of $1,946.76 appeared in the transaction history on February 28, 2022.

## Self Received Notice via CRA Dispute Channels

113. Plaintiff disputed the Self tradeline directly with TransUnion, Experian, and Equifax on multiple occasions.

114. Upon information and belief, each of those consumer reporting agencies forwarded Plaintiff's disputes to Self pursuant to 15 U.S.C. § 1681i(a)(2) via the automated dispute system (ACDV/e-OSCAR).

115. Plaintiff alleges that Self received notice of those disputes from the CRAs, as evidenced by the fact that the CRAs subsequently reported to Plaintiff that Self had "verified" the tradeline as accurate.

116. Self therefore received notice of Plaintiff's disputes from consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2(b).

## Self's Investigation Was Unreasonable

117. Despite receiving notice of dispute from the CRAs, Self failed to conduct a reasonable investigation of the disputed information.

118. Self's responses to the CRA dispute notices consisted of automated re-verification without addressing the specific impossibilities and contradictions identified in Plaintiff's disputes, including the over-1000% utilization on a $300 secured card, the post-charge-off balance increases, the re-aging of delinquency, and the late payments added after charge-off.

119. Self failed to provide documentation explaining how a $1,946.76 charge was permitted to post on a $300 secured card or how the balance grew to $3,459 after charge-off.

120. Self failed to modify, delete, or permanently block the reporting of the disputed information despite the fact that its own furnished data reflected mathematically impossible utilization on a secured product.

121. Self also used the threat of continued or renewed credit reporting to exert pressure on a disputed account while litigation was ongoing.

122. Self's conduct violated 15 U.S.C. § 1681s-2(b) and N.Y. Gen. Bus. Law § 349 and was negligent and/or willful.

## F. LVNV Funding LLC

123. LVNV is a debt buyer and debt collector that attempted to collect and/or maintain derogatory reporting on a debt Plaintiff disputed and demanded to be validated.

124. Plaintiff sent LVNV written validation demands on or about February 3, 2024, and April 7, 2025, within thirty days of initial or renewed written communications from LVNV asserting that the debt was owed.

125. Those demands sought the original contract, proof of ownership, chain of title, and itemization or accounting support.

126. LVNV failed to provide competent validation. It did not provide the original contract, did not provide a complete chain of title, and did not adequately substantiate the alleged balance.

127. Despite that failure, LVNV continued collection-related conduct and/or continued furnishing or maintaining the debt as derogatory, including through the CRA Defendants.

### LVNV Received Notice via CRA Dispute Channels

128. Plaintiff disputed LVNV's reporting with the CRAs, which on information and belief transmitted ACDV/e-OSCAR notices to LVNV under § 1681i(a)(2).

129. LVNV, after receiving such CRA-initiated notice, failed to conduct a reasonable investigation and failed to correct or delete disputed and unverifiable information.

130. LVNV's conduct violated 15 U.S.C. §§ 1692g(b), 1692e, 1692f, and 1681s-2(b) and was negligent and/or willful.

# VI. PHYSICAL INJURY, ECONOMIC COMPULSION, AND AGGRAVATION ALLEGATIONS

131. Defendants' continued misreporting and failure to correct inaccurate tradelines denied Plaintiff access to essential credit-based relief, including reasonable vehicle, housing, and mortgage-related financing opportunities.

132. Because of Defendants' conduct, Plaintiff was excluded from normal sources of affordable credit and foreseeably forced into

prolonged rideshare work and other high-risk gig-economy activity to generate income under economic compulsion rather than voluntary choice.

133. On November 16, 2024, while working as a rideshare driver under this economic duress and credit exclusion, Plaintiff was violently rear-ended at a red light and sustained severe physical injuries, including concussion, cervical disc trauma with bulging, neurocognitive impairment, jaw dysfunction, vertigo, neck sprain, and related pain and functional limitation.

134. Plaintiff's medical records documented that he was "working under duress" and "75% temporarily disabled," and an acute exacerbation note dated August 1, 2025, identified driving rideshare with rapid head movements as increasing his neck pain.

135. Plaintiff alleges that, but for Defendants' years-long willful and negligent misreporting and credit damage, he would have had access to reasonable financing and related financial relief and would not have been economically compelled to continue physically strenuous and risky driving activity to the same extent.

136. Plaintiff further alleges that Defendants' continued publication of inaccurate and unverifiable tradelines after the November 2024 collision forced him to continue driving despite medical restrictions in order to meet basic expenses, thereby foreseeably aggravating and prolonging his injuries.

137. The physical injuries, aggravation of injuries, pain and suffering, medical expense, and lost earning capacity alleged herein were a foreseeable consequence of Defendants' prolonged statutory violations and the economic compulsion those violations created.

# VII. ADDITIONAL ECONOMIC AND CREDIT-BASED HARM

138. As a direct and proximate result of Defendants' misconduct, Plaintiff suffered a broad pattern of credit-based and economic harms that were concrete, non-speculative, and reasonably foreseeable.

139. Plaintiff was denied multiple forms of consumer credit during the relevant period, including denials by buy-now-pay-later / subprime or lenient lenders such as Klarna in or about 2023 and again in 2025, despite such entities being among the more forgiving creditors in the marketplace.

140. Plaintiff also was denied education-related financing, including by Sallie Mae, as a result of derogatory tradelines and depressed credit scores caused or maintained by Defendants' inaccurate reporting and unreasonable procedures.

141. Plaintiff incurred higher borrowing costs on credit he was able to obtain, including higher interest rates and more onerous terms, due to Defendants' misreporting and failure to correct inaccurate tradelines.

142. Because of the prolonged derogatory reporting and depressed scores, Plaintiff was unable to meaningfully utilize his VA loan eligibility to obtain mortgage financing during a period of historically low interest rates prior to 2020.

143. As a result, Plaintiff was deprived of the opportunity to purchase a home using favorable VA-backed terms at substantially lower interest rates than those available later, causing long-term housing, wealth-building, and affordability harm.

144. Plaintiff also faced rental barriers, including denials or adverse decisions from landlords and property managers who relied on Defendants' inaccurate reports in evaluating his rental applications.

145. Plaintiff was required to pay higher security deposits and accept less favorable housing and neighborhood conditions than he could have obtained with accurate credit reporting.

146. Plaintiff paid higher insurance premiums, including for auto and other insurance lines, because insurers used Defendants' derogatory reporting and scores in pricing his policies.

147. Plaintiff incurred higher up-front and recurring credit-related charges, fees, and costs as a direct result of the poor credit profile created and maintained by Defendants' conduct.

148. Defendants' misreporting and the resulting derogatory credit profile prevented Plaintiff from qualifying for better, more stable, and better-paying employment opportunities that consider credit history, and pushed him toward higher-risk rideshare/gig work.

149. The same misreporting made it materially more difficult for Plaintiff to transition into safer, less physically demanding work after his accident, thereby prolonging the economic and physical effects of his injuries.

150. These harms were not isolated, but persisted continuously for over six years due to Defendants' repeated monthly reporting of inaccurate and unverifiable credit information.

151. These harms were the direct, foreseeable, and natural consequences of Defendants' continued reporting of inaccurate and unverified credit information.

152. Such harms are widely recognized consequences of derogatory credit reporting within the consumer reporting and credit-scoring industry, and are understood by Defendants to be predictable outcomes of prolonged derogatory tradelines.

# VIII. CLAIMS FOR RELIEF

## G. Per-Defendant Harm Linkage

153. The CAC tradeline, as reported by TransUnion, Experian, and Equifax, was a primary driver of Plaintiff's overall credit collapse, continued credit exclusion, and inability to obtain normal vehicle and mortgage financing.

154. The CRA Defendants' republication and re-verification of RAC, Self, and LVNV tradelines compounded the damage by keeping Plaintiff's reports saturated with severe derogatories across multiple trade lines, which lenders, insurers, landlords, and employers reasonably relied upon in denying or worsening terms.

155. RAC's contradictory and re-aged reporting made Plaintiff appear more deeply and persistently delinquent than he was, amplifying the credit harm.

156. Self's reporting of extreme utilization and post-charge-off balance growth on a secured $300 card, combined with its failure to fix the Hertz charge issue, portrayed Plaintiff as reckless or irresponsible with credit in a way that materially reduced his creditworthiness.

157. LVNV's refusal to validate while continuing collection and derogatory reporting independently harmed Plaintiff's credit and increased Plaintiff's economic pressure and stress.

## COUNT I: Violation of FCRA, 15 U.S.C. § 1681e(b) (Against TransUnion, Experian, and Equifax)

158. Plaintiff repeats and realleges paragraphs 1 through 157.

159. Section 1681e(b) requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

160. The CRA Defendants failed to follow reasonable procedures to assure maximum possible accuracy of the information they reported about Plaintiff.

161. Despite repeated disputes and clear indicators of inaccuracy and internal contradiction, the CRA Defendants failed to implement and apply reasonable procedures to ensure maximum possible accuracy of the information they reported about Plaintiff.

162. These failures included, but were not limited to: (a) continuing to report CAC as an active, monthly worsening delinquency after repeated disputes and despite the obligation having been satisfied and/or extinguished; (b) continuing to report or failing to correct RAC despite facial contradictions and misleading charge-off/past-due treatment; (c) continuing to report or failing to correct Self despite secured-limit impossibility, post-charge-off balance problems, and re-aging allegations; and (d) continuing to report or failing to correct LVNV after dispute and lack of validation.

163. Their heavy and prolonged reliance on automated e-OSCAR or ACDV processes without meaningful human review, escalation protocols, or reconciliation of obvious internal contradictions was objectively unreasonable and not a "reasonable procedure" under § 1681e(b).

164. No reasonable interpretation of § 1681e(b) permits consumer reporting agencies to rely blindly on automated furnisher responses while ignoring consumer-submitted documentary evidence, CFPB complaints, litigation notice, and obvious facial contradictions in tradeline data over a period of years.

165. **The egregious nature of TransUnion's conduct is highlighted by the fact that TransUnion is the only bureau still reporting 68 months of missed payments for a 2019 event, whereas Equifax and Experian have already corrected the record.**

This proves TransUnion's procedures are uniquely flawed and willful.

166. The divergent outcome in the handling of the CAC tradeline —where two nationwide consumer reporting agencies ceased reporting the tradeline after reinvestigation while a third continued reporting the same disputed information— further evidences that at least one set of procedures was not reasonably calculated to assure maximum possible accuracy and that TransUnion's procedures, in particular, were deficient.

167. The willful and reckless nature of TransUnion's conduct is underscored by the divergent outcomes of the reinvestigation process. Following Plaintiff's repeated disputes and the commencement of this litigation, two nationwide consumer reporting agencies—Experian and Equifax—ceased reporting the CAC tradeline after determining, upon reinvestigation, that the information was inaccurate, unverifiable, or otherwise improper to continue reporting. In stark contrast, TransUnion has persisted in reporting the same discredited information, including an egregious string of 68 consecutive months of "new" delinquencies for an auto obligation that was extinguished in 2019. This makes TransUnion a lone holdout in the face of industry-standard corrections and reflects an objectively unreasonable application of its statutory duties under 15 U.S.C. §§ 1681e(b) and 1681i.

168. The CRA Defendants' conduct was negligent and/or willful.

## COUNT II: Violation of FCRA, 15 U.S.C. § 1681i (Against TransUnion, Experian, and Equifax)

169. Plaintiff repeats and realleges paragraphs 1 through 168.

170. Section 1681i requires consumer reporting agencies to conduct reasonable reinvestigations when consumers dispute the completeness or accuracy of information in their credit files.

171. After Plaintiff disputed inaccurate and unverifiable information, the CRA Defendants were required to conduct reasonable reinvestigations but failed to do so.

172. Instead, they simply verified, continued, or failed to correct information relating to CAC, RAC, Self, and LVNV despite

repeated notice, long-running dispute history, CFPB escalation, litigation notice, and facial irregularities in the reported data.

173. The CRA Defendants unreasonably relied on furnisher responses through e-OSCAR and ACDV processes while ignoring Plaintiff's documentation and the contradictions on the face of the tradelines.

174. No reasonable interpretation of § 1681i permits an agency to call this kind of cursory "parroting" a reasonable reinvestigation under the circumstances presented here.

175. The CRA Defendants acted negligently in that they failed to exercise reasonable care in conducting reinvestigations and instead relied on automated procedures known to be inadequate for ensuring accuracy when consumers provided specific factual challenges and documentary support.

176. The CRA Defendants acted willfully in that they consciously avoided or recklessly disregarded their obligation to conduct reasonable reinvestigations, continued to rely on automated procedures they knew or should have known were inadequate, ignored repeated consumer challenges over a period of years, ignored CFPB complaints and litigation notice, and continued to publish facially contradictory and impossible data despite obvious red flags.

177. **TransUnion's post-litigation persistence in reporting the CAC account after Experian and Equifax ceased their reporting demonstrates conscious disregard and reckless indifference to Plaintiff's statutory rights.**

178. **The willful nature of TransUnion's failure to conduct reasonable reinvestigations is further demonstrated by the fact that two other nationwide consumer reporting agencies —Experian and Equifax—ceased reporting the same CAC tradeline after conducting their reinvestigations, while TransUnion alone persisted in reporting 68 consecutive months of new delinquencies despite receiving the same dispute information and having access to the same underlying facts. This divergence proves that TransUnion's reinvestigation was either non-existent or a sham, and that TransUnion consciously disregarded its statutory obligation under 15 U.S.C. § 1681i.**

179. Their conduct violated 15 U.S.C. § 1681i and was negligent and/or willful.

## COUNT III: Violation of FCRA, 15 U.S.C. § 1681s-2(b) (Against Regional Acceptance Corporation)

180. Plaintiff repeats and realleges paragraphs 1 through 179.

181. Section 1681s-2(b) requires furnishers to conduct investigations and correct inaccurate information after receiving notice of a dispute from a consumer reporting agency.

182. Plaintiff disputed the RAC tradeline directly with TransUnion, Experian, and Equifax on multiple occasions.

183. Upon information and belief, TransUnion, Experian, and Equifax forwarded Plaintiff's disputes to RAC pursuant to 15 U.S.C. § 1681i(a)(2) via the ACDV/e-OSCAR system.

184. RAC received notice of Plaintiff's disputes from the consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2(b), as evidenced by the fact that the CRAs subsequently reported to Plaintiff that RAC had "verified" the tradeline as accurate.

185. RAC failed to conduct a reasonable investigation and failed to correct or delete inaccurate, contradictory, misleading, and re-aged information about Plaintiff.

186. RAC acted negligently in that it failed to exercise reasonable care in investigating the disputed information and instead relied on automated responses without substantive review.

187. RAC acted willfully in that it consciously avoided or recklessly disregarded its obligation to conduct a reasonable investigation and continued to furnish facially contradictory data despite notice of dispute.

188. RAC violated 15 U.S.C. § 1681s-2(b).

## COUNT IV: Violation of FCRA, 15 U.S.C. § 1681s-2(b) (Against Self Financial, Inc.)

189. Plaintiff repeats and realleges paragraphs 1 through 188.

190. Plaintiff disputed the Self tradeline directly with TransUnion, Experian, and Equifax on multiple occasions.

191. Upon information and belief, TransUnion, Experian, and Equifax forwarded Plaintiff's disputes to Self pursuant to 15 U.S.C. § 1681i(a)(2) via the ACDV/e-OSCAR system.

192. Self received notice of Plaintiff's disputes from the consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2(b), as evidenced by the fact that the CRAs subsequently reported to Plaintiff that Self had "verified" the tradeline as accurate.

193. After receiving this CRA-initiated notice, Self failed to conduct a reasonable investigation, failed to correct inaccurate or misleading reporting, and continued furnishing derogatory information after dispute and after closure.

194. Self used continued or threatened reporting as leverage on a disputed account.

195. Self acted negligently in that it failed to exercise reasonable care in investigating the disputed information and instead relied on automated responses without substantive review.

196. Self acted willfully in that it consciously avoided or recklessly disregarded its obligation to conduct a reasonable investigation, continued to furnish mathematically impossible utilization data despite notice of dispute, and used continued or threatened derogatory reporting as leverage during ongoing litigation.

197. Self violated 15 U.S.C. § 1681s-2(b).

## COUNT V: Violation of FDCPA, 15 U.S.C. § 1692g(b) (Against LVNV Funding LLC)

198. Plaintiff repeats and realleges paragraphs 1 through 197.

199. LVNV is a debt collector within the meaning of 15 U.S.C. § 1692a(6).

200. Plaintiff sent LVNV written validation demands within thirty days of LVNV's initial or renewed written communications asserting that the debt was owed, disputing the debt and requesting validation including the original contract, proof of ownership, chain of title, and itemization.

201. LVNV failed to provide competent validation but continued collection-related conduct and credit reporting.

202. LVNV's continuation of collection-related conduct and derogatory credit reporting without providing competent validation violated 15 U.S.C. § 1692g(b).

203. LVNV violated 15 U.S.C. § 1692g(b).

## COUNT VI: Violation of FDCPA, 15 U.S.C. § 1692e (Against LVNV Funding LLC)

204. Plaintiff repeats and realleges paragraphs 1 through 203.

205. Section 1692e prohibits debt collectors from using false, deceptive, or misleading representations in connection with the collection of any debt.

206. LVNV falsely represented or implied that the debt was valid, substantiated, and legally enforceable while refusing to provide competent validation in response to Plaintiff's written demands.

207. LVNV's continued assertion of the debt through credit reporting and collection-related conduct without providing the original contract, proof of ownership, chain of title, or adequate substantiation constituted a false representation of the character, legal status, and validity of the debt.

208. LVNV violated 15 U.S.C. § 1692e.

## COUNT VII: Violation of FDCPA, 15 U.S.C. § 1692f (Against LVNV Funding LLC)

209. Plaintiff repeats and realleges paragraphs 1 through 208.

210. Section 1692f prohibits debt collectors from using unfair or unconscionable means to collect or attempt to collect any debt.

211. LVNV used unfair and unconscionable means to attempt to collect or preserve collection leverage on the alleged debt by maintaining derogatory credit reporting and continuing collection-related conduct without validating the debt.

212. LVNV violated 15 U.S.C. § 1692f.

## COUNT VIII: Violation of FCRA, 15 U.S.C. § 1681s-2(b) (Against LVNV Funding LLC)

213. Plaintiff repeats and realleges paragraphs 1 through 212.

214. To the extent LVNV furnished information to the CRA Defendants after receiving notice of Plaintiff's disputes from those CRAs under § 1681i(a)(2), LVNV failed to conduct a reasonable investigation and failed to correct or delete disputed and unverifiable information.

215. LVNV violated 15 U.S.C. § 1681s-2(b).

## COUNT IX: Violation of New York General Business Law § 349 (Against Self Financial, Inc.)

216. Plaintiff repeats and realleges paragraphs 1 through 215.

217. New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

218. Self engaged in consumer-oriented conduct that was materially misleading, including representing and operating a secured credit-card product with a $300 secured limit while allowing or imposing charges grossly beyond that limit, then closing the account, continuing derogatory reporting, failing to resolve the dispute, and using the resulting derogatory treatment against Plaintiff.

219. Self's conduct was consumer-oriented because it involved the marketing, issuance, servicing, and reporting of a consumer credit product.

220. Self's conduct was materially misleading because it held out a secured card with a stated $300 limit while permitting or imposing charges far beyond that limit and then treating the resulting balance as Plaintiff's delinquent obligation.

221. Plaintiff was injured as a result, including through credit impairment, denial of credit opportunities, reputational harm, and related damages.

222. Self violated N.Y. Gen. Bus. Law § 349.

# IX. DAMAGES

223. As a direct and proximate result of each Defendant's conduct described above, Plaintiff suffered actual damages, including but not limited to: credit impairment, denial of credit opportunities, increased borrowing costs, higher insurance premiums, housing and neighborhood harms, employment limitations, loss of favorable mortgage opportunities, reputational injury, emotional distress, financial hardship, and litigation-related costs.

224. Plaintiff also suffered foreseeable physical-injury aggravation, medical expense, pain and suffering, lost earning capacity, and related consequential harm arising from Defendants' continued statutory violations and the economic necessity and compulsion they created.

225. Plaintiff seeks all actual damages permitted by law, including damages caused by prolonged inaccurate reporting, unlawful collection activity, and the economic and physical consequences flowing from that misconduct.

226. Plaintiff also seeks statutory damages where available under the FCRA, FDCPA, and New York law.

227. Plaintiff also seeks punitive damages for willful and reckless misconduct where available, as Defendants' conduct reflected an objectively unreasonable interpretation and application of their statutory duties under the FCRA and FDCPA.

228. Plaintiff also seeks costs, interest, and any other relief allowed by law.

## X. PRAYER FOR RELIEF

229. WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A. Awarding actual damages in an amount to be determined at trial;

B. Awarding statutory damages where authorized;

C. Awarding punitive damages where authorized;

D. Awarding damages for aggravated physical injury and related consequential harm to the fullest extent permitted by law;

E. Awarding costs, interest, and such further relief as the Court deems just and proper;

F. Ordering correction and/or deletion of inaccurate tradelines to the extent authorized by law;

G. Granting such other and further relief as this Court deems proper.

## XI. JURY DEMAND

230. Plaintiff demands a trial by jury on all issues so triable.

Dated: March 31, 2026

Respectfully submitted,

/s/ David D. Adams

David D. Adams
Pro Se
916 Prospect Ave
Buffalo, NY 14213
(716) 435-6420
davidadams2891@yahoo.com