UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

DAVID D. ADAMS,

Plaintiff, Pro Se,

v.

CREDIT ACCEPTANCE CORPORATION, LVNV FUNDING LLC,

TRANSUNION LLC, EXPERIAN INFORMATION SOLUTIONS, INC.,

EQUIFAX INFORMATION SERVICES LLC, SELF FINANCIAL, INC., and

REGIONAL ACCEPTANCE CORPORATION,

Defendants.

Case No. 1:25-cv-00410-JLS-HKS

---

**PLAINTIFF'S REPLY TO DEFENDANTS TRANSUNION LLC, EXPERIAN INFORMATION SOLUTIONS, INC., AND EQUIFAX INFORMATION SERVICES LLC'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO REPORT, RECOMMENDATION AND ORDER**

Plaintiff David D. Adams respectfully submits this Reply to the Response filed jointly by Defendants TransUnion LLC, Experian Information Solutions, Inc., and Equifax Information Services LLC (collectively, "CRA Defendants") on April 16, 2026 [Dkt. No. 114].

---

**PRELIMINARY STATEMENT**

The CRA Defendants' Response makes three arguments: that leave to amend should be denied for undue delay; that ACDV-based reinvestigation is categorically reasonable as a matter of law; and that the Magistrate already analyzed Plaintiff's reinvestigation claims through his submitted documents

and found them wanting. Each argument misreads the record, misstates the legal standard, or selectively quotes authority that does not support the proposition for which it is cited.

Most critically, the CRA Defendants' brief does not engage with the single most significant fact in the Second Amended Complaint: TransUnion is the only one of the three major CRAs that has continued reporting the CAC tradeline as an active, monthly-worsening delinquency through and after this litigation — after Experian ceased reporting the tradeline following the initiation of this suit in 2025, and after Equifax — which was still reporting the CAC tradeline as of December 21, 2025, as reflected in Plaintiff's credit report from that date — eventually ceased reporting it at some point thereafter. That divergent outcome is not speculation. It is an objective fact that the CRA Defendants' brief does not meaningfully address.

---

## ARGUMENT

### I. THE DELAY ARGUMENT FAILS BECAUSE THE MAGISTRATE ALREADY REJECTED IT, THE DOCKET DISPROVES IT, AND THE RECORD SHOWS CONTINUOUS PLAINTIFF ACTIVITY

The CRA Defendants argue that Plaintiff delayed in seeking leave to amend because he filed dozens of motions after June 2025 without requesting amendment. This argument was effectively considered and rejected by the Magistrate, whose Recommendation specifically found that Plaintiff "has not had an opportunity to amend the pleading to address the deficiencies raised in those motions." R&R at 21. That finding reflects the correct legal analysis. The docket confirms it.

**The "nearly a year" characterization is factually inaccurate.** The case was filed on May 12, 2025 [Dkt. 1]. The first Motion to Dismiss — Equifax's — was filed on June 23, 2025 [Dkt. 21]. Self Financial, RAC, and LVNV followed in late July 2025 [Dkts. 80, 82, 84]. Experian filed on July 25, 2025 [Dkt. 86]. The R&R identifying pleading deficiencies issued on March 30, 2026 [Dkt. 107]. Plaintiff filed his SAC approximately fourteen days later. From the first Motion to Dismiss to the SAC is approximately nine and a half months. From the last Motion to Dismiss — Experian's — to the SAC is approximately eight and a half months. "Nearly a year" is an exaggeration of the record, and the docket numbers establish it.

**The Court itself froze the procedural posture.** On June 23, 2025, the Magistrate issued a Text Order terminating all of Plaintiff's pending discovery motions as "premature" and directing that "[a] Case Management Order setting discovery deadlines will be issued once defendants have answered the complaint." [Dkt. 18.] No defendant ever answered. Every defendant filed a Motion to Dismiss or a motion to compel arbitration instead. Because no answer was ever filed, no Case Management Order was ever issued, no scheduling conference was ever held, and no discovery deadline was ever set. The procedural posture was locked from June 23, 2025 forward — not by Plaintiff's inaction, but by Docket 18 and the defendants' unanimous choice to challenge rather than answer. Plaintiff cannot be charged with delay for failing to amend during a period when the Court had explicitly deferred all next steps pending defendant answers that never came.

**The docket shows consistent, sustained Plaintiff activity throughout the period the CRA Defendants characterize as "delay."** Plaintiff filed timely Memoranda in Opposition to every Motion to Dismiss: Dkt. 41 (Equifax, June 24, 2025), Dkt. 88 (Experian, July 25, 2025), Dkts. 89, 90, 91 (LVNV, RAC, Self Financial, July 24, 2025). He filed supplemental oppositions at Dkts. 92, 93, 94, and 97. He filed a supplement to the Amended Complaint at Dkt. 102 (November 7, 2025), a second supplement at Dkt. 103 (November 10, 2025), and a notice of supplemental medical evidence at Dkt. 104 (December 4, 2025). This is not the record of a party who abandoned his claims or sat on his hands. It is the record of a pro se plaintiff actively prosecuting a case against seven defendants — each represented by separate counsel — in a procedural posture that the Court's own orders had suspended pending resolution of dispositive motions.

**The R&R was the first definitive judicial identification of specific pleading deficiencies.** The Magistrate's March 30, 2026 R&R [Dkt. 107] was the first time a judge identified, with specificity, what the Amended Complaint lacked at the pleading level. Prior to that ruling, Plaintiff had no definitive judicial guidance on what the complaint was missing — only the defendants' self-serving motion arguments. The correct time to measure a plaintiff's response to identified pleading deficiencies is from the date those deficiencies were identified: March 30, 2026. Measured from that date, Plaintiff responded in approximately fourteen days.

The CRA Defendants cite *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990), for the proposition that the burden is on the movant to explain delay. But *Cresswell* involved a plaintiff who had been aware of the

facts underlying a proposed amendment for years before seeking to add them. That is not this case. The docket shows Plaintiff actively filing opposition briefs, supplemental submissions, and evidence throughout 2025. There is no dormancy here — there is a pending motion to dismiss log that the Court itself took months to resolve.

Furthermore, the CRA Defendants must show prejudice beyond the mere fact of amendment. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008). They identify none. No discovery has occurred. No trial date has been set. No reliance interests have been disrupted. No Case Management Order has been entered. The case remains at the pleading stage — exactly where it has been since June 2025. The prejudice argument is empty.

## II. THE ACDV ARGUMENT PROVES TOO MUCH AND MISAPPLIES THE STANDARD

The CRA Defendants argue that ACDV/e-OSCAR use is "objectively reasonable as a matter of law" and cite a string of cases for the proposition that courts have routinely found ACDV-based reinvestigation to be adequate. This argument proves too much — and the cases they cite do not say what they claim.

**The cases establish that ACDV is a reasonable method, not that ACDV is always sufficient regardless of circumstances.** The question under § 1681e(b) is not whether a CRA used ACDV — it is whether the CRA's procedures as applied were reasonably designed to assure maximum possible accuracy given the specific dispute before it. *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023). The Second Circuit has never held that ACDV use is a per se defense to unreasonable procedures claims.

The SAC's unreasonable procedures allegations are not premised on ACDV use alone. They are premised on ACDV-only reinvestigation in the face of:

- Four rounds of certified dispute correspondence beginning in late 2019, including documentary evidence of the 2019 total-loss event and GAP insurance payout

- Multiple CFPB complaint filings against the CRA Defendants specifically regarding the CAC tradeline — a government-level escalation that triggered direct regulatory contact with the furnisher and produced written responses

- Service of a federal complaint in 2025 specifically alleging that the CAC tradeline was inaccurate

- Facial contradictions in the tradeline data itself — including a 60-day delinquency entry for October 2019 reported on the CAC tradeline as of November 8, 2019, when the underlying vehicle had been totaled on October 1, 2019 and the obligation extinguished by GAP insurance payout; a derogatory entry reported for a vehicle that no longer existed, on a debt that had already been discharged, is not a dispute about accuracy — it is a logical impossibility visible on the face of the tradeline itself. This was followed by an extended pattern of consecutive delinquency reporting on that same extinguished obligation. A reasonable procedure would, at minimum, flag such a contradiction for escalation or independent review. The absence of any such mechanism — despite repeated disputes and documentary evidence — supports a plausible inference that Defendants' procedures were not designed to detect or resolve inaccuracies of this kind. The causal connection between this reporting and Plaintiff's

credit damage is plausibly supported and objectively reflected by: following removal of the CAC tradeline from TransUnion in March 2026, Plaintiff's Payment History factor moved immediately from 48 ("Needs Work") to 100 ("Excellent") with an approximately 15-point score increase — an instantaneous and documented correction that isolates the tradeline as the primary suppressor of Plaintiff's credit profile throughout the reporting period

• Simultaneous disputed tradelines across four furnishers — CAC, RAC, Self Financial, and LVNV — all appearing on Plaintiff's reports at the same time, all disputed, and all verified through the same automated process

ACDV is a communication mechanism, not a verification standard, and its use does not relieve a CRA of its independent obligation to ensure accuracy. A procedure that transmits a dispute to a furnisher but does not evaluate contradictory documentary evidence already in the CRA's file is not a procedure reasonably designed to assure accuracy — regardless of whether the furnisher returns a verification response. A CRA that relies exclusively on automated furnisher verification while ignoring consumer-submitted documentary evidence — including the furnisher's own written denial of the account's existence, submitted through certified mail disputes beginning in 2019 and through government CFPB channels in 2020 — CFPB escalations, federal litigation notice, and obvious facial contradictions in tradeline data does not satisfy § 1681e(b) simply because it used the ACDV system to do so. That is precisely the "something more" inquiry the Second Circuit and district courts have recognized. *See Hintermaier v. Equifax Info. Servs., LLC*, 2026 WL 82479, at *4 (S.D.N.Y. Jan.

12, 2026) ("inaccuracy is a threshold question" and procedures must be evaluated in context).

**The SAC pleads this specifically.** SAC ¶¶ 55–62 (TransUnion), ¶¶ 69–72 (Experian), ¶¶ 85–88 (Equifax) each allege that the CRA Defendants maintained and followed automated verification procedures that deferred to furnisher responses as conclusive, did not include escalation protocols for consumer-submitted documentary evidence, and did not require independent review when tradeline data displayed facial contradictions. These are not conclusory recitations of statutory language — they are specific allegations about the CRA Defendants' procedural choices that, if proven, would constitute unreasonable procedures under § 1681e(b).

These allegations do not ask the Court to resolve factual disputes, but to recognize that the SAC pleads sufficient facts to render the reasonableness of Defendants' procedures a question for discovery and factfinding. At minimum, these facts render the reasonableness of Defendants' procedures a question that cannot be resolved at the pleading stage.

---

## III. THE CFPB COMPLAINT HISTORY AND SUBSEQUENT INVESTIGATION RESULTS INDEPENDENTLY DEFEAT THE ACDV SUFFICIENCY ARGUMENT

The CRA Defendants' ACDV argument omits an inconvenient fact that appears throughout the record: the disputed tradelines were not merely verified through the CRAs' internal ACDV process — they were also investigated and re-verified in response to formal CFPB complaints Plaintiff filed against the bureaus and furnishers, and the documentary results of those investigations are in Plaintiff's possession and will be produced in discovery.

A CFPB complaint is not a routine dispute. It is a government-level regulatory escalation that requires a formal written response, triggers direct CFPB contact with the company, and is documented in the CFPB's public and internal databases. Plaintiff filed CFPB complaints against TransUnion, Experian, and Equifax regarding the CAC tradeline on March 17, 2020. Each complaint was identical in substance and was accompanied by the same critical attachment: a letter Plaintiff had received directly from CAC — the furnisher — dated **February 13, 2019**, stating that CAC was "unable to locate an account with the account number and/or social security number you provided" and that it was therefore "unable to conduct an investigation." That letter predates the CFPB complaints by more than thirteen months. Plaintiff had already submitted it to each bureau through certified mail disputes in 2019. By March 2020, when Plaintiff attached it to the CFPB complaints, each bureau had been in possession of the furnisher's own denial letter — through at least one prior dispute channel — for over a year. Plaintiff attached that letter to each CFPB complaint specifically to put each bureau on notice, through a government regulatory channel, that the furnisher itself had denied the account's existence in writing.

The CFPB transmitted each complaint — with that attachment — to the respective bureau. What followed is fully documented for each defendant:

**Equifax — CFPB Complaint No. 200317-4845242** (filed 3/17/2020): Equifax's interim response confirmed it had "initiated an investigation" and "sent a request for verification electronically to each of your creditors." Its final CFPB portal response on May 11, 2020 stated "an investigation with the

reporting company was completed and results were mailed to you." Equifax did not address the CAC denial letter in either response. The investigation results themselves are no longer accessible online — Equifax's own notification emails advised that results would remain available for only 30 days — but their completion is confirmed by two separate emails Equifax sent directly to Plaintiff:

> • Email dated **May 6, 2020** (Confirmation No. **0122017179**): "We've completed your Equifax credit file dispute, and you can view your results online."
>
> • Email dated **May 24, 2020** (Confirmation No. **0132065244**): "We've completed your Equifax credit file dispute, and you can view your results online."

Both emails contain Equifax's own description of its process: "After completing your dispute review, we will make changes to your credit report based on the information you provided if we are able to. If not, we will contact the reporting company to verify the accuracy of the information you're disputing." The CAC tradeline was not removed. Equifax contacted CAC. CAC verified. The tradeline remained.

Equifax then conducted at least one additional reinvestigation in September 2022, confirmed by a written dispute response dated **September 2, 2022** (Confirmation No. **2244512449**), in which Equifax again described forwarding "any relevant information and supporting documentation you provided us with the dispute" to the reporting company. The CAC tradeline was not removed following that investigation either.

The cumulative Equifax record — CFPB complaint investigation, two May 2020 dispute completions, September 2022 paper response, and

documentary evidence spanning from the month of lawsuit filing through the end of 2025 — reflects a minimum of four documented reinvestigation cycles spanning five and a half years, each producing the same result: verified and retained. Plaintiff's May 3, 2025 Equifax credit report — pulled the same month the federal complaint was filed — confirms CAC was still the "Oldest Account" on his Equifax file at a balance of $2,194, anchoring his entire credit history length at 7 years, 2 months. His December 21, 2025 Equifax report confirms the tradeline was still there, still listed as the oldest account, seven months later. That continuous window — from the date of service through Equifax's motion to dismiss briefing and into late December 2025 — establishes that Equifax was actively reporting the disputed tradeline throughout the entire period it was simultaneously arguing in this Court that Plaintiff's claims should be dismissed. The December 21, 2025 report makes the post-service conduct specific: CAC's Date Reported field on that report reads **June 17, 2025** — fifteen days after service of the federal complaint on June 2, 2025. CAC submitted a new data update to Equifax after being served, and Equifax accepted and published it without correction. Equifax's own file simultaneously contained internally contradictory data on the CAC account: the detailed account record on both the April 8, 2025 and May 3, 2025 Equifax reports reflects an Account Status of OVER_120_DAYS_PAST_DUE, while the consumer-facing installment account summary on those same reports displays 0 late payments — two irreconcilable representations of the same account's delinquency status published simultaneously on the same credit report, traceable to the data CAC was furnishing through its Metro 2 submissions and accepted by

Equifax without correction through multiple reinvestigation cycles. Equifax ceased reporting the CAC tradeline at some undisclosed point after December 21, 2025, without explanation.

Notably, Equifax's own November 8, 2019 credit report — accessible via the MyEquifax portal at that date — listed Plaintiff's oldest account as "JPMCB - CARD SERVICES," not the CAC tradeline. By December 21, 2025, the CAC account had become Plaintiff's oldest account on Equifax. This means Equifax maintained the CAC tradeline on Plaintiff's file through the natural aging-off of older legitimate accounts — continuing to report it as an active derogatory long after it should have been removed, and long enough that it became the anchor of Plaintiff's credit history on that bureau.

Equifax will likely argue that its eventual cessation of reporting — sometime after December 21, 2025 — demonstrates that its procedures ultimately worked and that any error was self-correcting. That argument fails for two independent reasons. First, it proves nothing about the reasonableness of Equifax's procedures during the five-plus years it continued to report the tradeline after receiving the CAC denial letter through multiple dispute channels. Post hoc correction after years of reporting does not retroactively render prior procedures reasonable. The FCRA's reasonableness inquiry applies to the procedures in place at the time of each reinvestigation — not to the eventual outcome years later. *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008) (reasonableness evaluated as of the time the disputed information was reported, not in hindsight). Second, Equifax has offered no explanation for why it stopped — not to Plaintiff, not in its CFPB responses, and not in its

brief. That silence is itself a fact. A CRA that quietly removes a tradeline after years of repeated verification — without explanation, without a correction notice, without any acknowledgment that the prior verifications were erroneous — does not demonstrate that its procedures worked. It demonstrates that something changed in Equifax's internal assessment that was never disclosed. That internal change, and what triggered it, is precisely the kind of procedural question that discovery is designed to answer.

**TransUnion — CFPB Complaint No. 200317-4845360** (filed 3/17/2020): TransUnion acknowledged receipt of Plaintiff's documentation and promised to "review all information and any additional documentation you provide to determine next steps." It completed its reinvestigation and issued a formal written investigation results letter dated **April 30, 2020** (File No. 361747307). That letter is unambiguous:

> *"VERIFIED AS ACCURATE: The disputed item was verified as accurate. We investigated the information you disputed and the disputed information was VERIFIED AS ACCURATE."*

The letter shows the CAC account active, in collection, with a balance of $1,392 past due, and a payment history grid of continuous derogatory entries going back to 2018. TransUnion received Plaintiff's documentation — including the CAC denial letter dated February 13, 2019 — and returned a formal written finding that the data was verified accurate.

Less than four weeks later, on **May 22, 2020**, TransUnion sent Plaintiff a second letter (File No. 361747307) in response to a subsequent dispute. That letter invoked the FCRA's repeat-dispute provision, stating: "Our records show that we previously completed an investigation of the below

item(s) and the data furnisher(s) verified the information on your credit file. As outlined in the Fair Credit Reporting Act, unless you have additional relevant information that supports the change you're requesting... we are not required to reinvestigate the same item(s) again at this time."

This invocation of the § 1681i(f) frivolous-or-irrelevant exemption is itself evidence of unreasonable procedures. TransUnion had already received and reviewed the CAC denial letter — submitted via the CFPB complaint channel just weeks earlier — and had issued a "VERIFIED AS ACCURATE" finding while holding that letter in Plaintiff's file. When Plaintiff disputed again, TransUnion declined to reinvestigate on the grounds that no new information had been provided. But the most probative piece of information — the furnisher's own written statement that it could not locate the account — had already been provided, had already been reviewed, and had already been disregarded. Invoking § 1681i(f) under those circumstances is not a legitimate procedural defense; it is a procedure that uses the statute's frivolous-dispute exception to insulate a prior erroneous verification from further scrutiny.

Moreover, the April 30, 2020 "VERIFIED AS ACCURATE" finding itself — which TransUnion used as the anchor for its § 1681i(f) refusal — was verifying data that included a 60-day delinquency entry for October 2019, reported on a vehicle loan for a car that had been totaled on October 1, 2019. TransUnion's own November 8, 2019 report projected the CAC tradeline would remain on Plaintiff's file until March 2026. The tradeline had already been generating new derogatory entries for an extinguished obligation for months before the April 2020 reinvestigation, and TransUnion verified it

accurate anyway — then used that verification to refuse further review. TransUnion continued reporting the CAC tradeline until approximately March 18, 2026 — when the tradeline was removed at the end of its projected seven-year reporting window, precisely consistent with TransUnion's own November 2019 estimate that the item would remain until March 2026. TransUnion did not identify or correct the error at any point during the reporting period; the tradeline was removed only when the statutory reporting window expired. The tradeline accumulated 68 consecutive months of new delinquency entries on an obligation extinguished in October 2019 — and was removed only because the statutory clock ran out, not because TransUnion's procedures ever identified the problem. That outcome is consistent with a system that processes disputes mechanically rather than analytically, and that relies on expiration rather than correction.

TransUnion's own payment history grid makes the temporal impossibility precise: the grid reflects a 60-day delinquency entry coded to October 2019 — the same month the vehicle was totaled on October 1, 2019. A 60-day delinquency requires that the account be two full payment cycles past due as of that month. That status is a chronological impossibility on a vehicle loan whose underlying collateral was destroyed and whose GAP obligation was extinguished before the month ended. TransUnion accepted and published that entry, then verified it accurate in April 2020 while that same impossibility was visible on the face of the data.

The final months of TransUnion's reporting further document that its reinvestigation procedures were non-responsive to active dispute activity.

TransUnion's own payment history grid reflects "AID" — Account in Dispute — codes for both May 2025 and June 2025, the final two months of active reporting before the tradeline's removal window arrived. Those codes confirm that TransUnion's system acknowledged the dispute was live during those months. Yet the account simultaneously continued to report a balance of $2,204 and $2,214 respectively, at 120-days-past-due status, with no substantive correction. TransUnion's own notation that the account was disputed did not trigger any change in what it was publishing to creditors about Plaintiff.

Finally, TransUnion's classification of the CAC account as perpetually "120 Days Past Due" — rather than advancing it to charge-off status — is itself a facial anomaly in the data that reasonable procedures should have flagged. Under standard Metro 2 reporting conventions and long-standing industry guidance, an account that has gone without payment for 180 days or more is expected to be reported as a charge-off. The CAC tradeline on TransUnion remained coded as an active pre-charge-off delinquency for over five years — from approximately April 2020 through its removal in March 2026 — without ever being reclassified. That is not a reporting pattern consistent with a performing or even a normally defaulting account. It is a classification that, on its face, does not correspond to any recognized account lifecycle stage, and that TransUnion's procedures accepted and re-verified repeatedly without apparent scrutiny.

**Experian — CFPB Complaint No. 200317-4845361** (filed 3/17/2020): Experian's CFPB response was the most explicit of the three. It stated directly: "We have reviewed and considered the information, including the

attachment you have supplied through the CFPB portal and directly to Experian." Experian confirmed in writing that it received and reviewed the CAC denial letter. It then issued a formal dispute results letter dated **August 6, 2020** (Report No. 1734-5729-10), confirming it had "contacted the company reporting the information you disputed, supplied them all relevant information and any documents you gave us with your dispute, and instructed them to: review all information we provide them about your dispute; verify the accuracy of the information." The CAC account outcome was listed as "Updated" — but the account data before and after the dispute was substantively identical: balance $1,588, status open and past due, with ongoing new delinquency entries continuing through the dispute period. Experian forwarded the CAC denial letter to CAC. CAC certified the information as accurate. Experian accepted that response without question and continued reporting the account until sometime after this suit was filed in May 2025.

The three-bureau record supports a compelling and plausible inference. CAC told Plaintiff in writing on February 13, 2019 that it could not locate the account by account number or Social Security number, and therefore could not conduct an investigation. Plaintiff submitted that letter through certified mail disputes to all three bureaus in 2019, and again attached it to government CFPB complaints in March 2020. Experian confirmed in writing that it received the letter and forwarded it to CAC. CAC then told Experian the information was accurate. Both representations — the denial and the verification — cannot simultaneously be accurate. At minimum, the contradiction between CAC's written denial to Plaintiff and its

apparent verification to the bureaus raises a plausible inference that the CRAs' reinvestigation procedures failed to surface or resolve a material inconsistency in the furnisher's own representations. All three bureaus accepted CAC's furnisher responses — despite holding CAC's contradictory letter in their files — and continued reporting the account for years. TransUnion formalized that acceptance with a written "VERIFIED AS ACCURATE" finding and continued reporting until the tradeline's seven-year statutory window expired in March 2026 — never having voluntarily corrected it. Equifax repeated the cycle at least four times across five years. Experian did the same and quietly stopped after this lawsuit was filed.

A procedure that accepts furnisher certifications while allegedly ignoring documentary evidence that the same furnisher had denied the account's existence in a prior written communication — submitted through multiple channels, over multiple years, by the same consumer — supports a plausible inference of unreasonable reinvestigation under § 1681e(b). Whether that conduct rises to willful disregard under *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007) — which encompasses reckless disregard of a consumer's statutory rights — is a question that cannot be resolved without examining the CRAs' internal procedures, escalation policies, and handling of consumer-submitted documentation. That is precisely the inquiry discovery is designed to enable.

---

## IV. THE SIMULTANEOUS MULTI-ACCOUNT PATTERN REQUIRED HEIGHTENED SCRUTINY THAT ACDV ALONE CANNOT SUPPLY

The CRA Defendants' brief treats this case as though it involved a single consumer disputing a single tradeline. It did not. At the same time that

Plaintiff was disputing the CAC tradeline, his reports contained disputed derogatory information from RAC, Self Financial, and LVNV — all simultaneously appearing across all three major CRAs, all disputed, and all verified through the same automated process.

The volume and pattern of disputes across a single consumer's file is itself a signal that reasonable procedures should address. A consumer who has disputed four separate accounts with four separate furnishers across all three major bureaus — and filed CFPB complaints on multiple occasions — is not a routine dispute. Reasonable procedures reasonably designed to assure maximum possible accuracy must account for patterns, not just individual tradelines processed in isolation.

The FCRA does not permit a CRA to process each dispute in a vacuum while ignoring the broader pattern on the same consumer's file. The SAC alleges that the CRA Defendants did exactly that — treating each ACDV cycle as a standalone transaction without escalation, without independent review, and without any mechanism to flag a file saturated with simultaneous disputed accounts supported by consumer-submitted documentation. That is an unreasonable procedure allegation that goes well beyond what the ACDV-is-adequate cases addressed.

The Experian August 26, 2025 dispute results letter (Report No. 0572-9369-10) documents this pattern with specificity. That single reinvestigation cycle processed disputes on the CAC tradeline, the LVNV/Resurgent collection account, and the Self Financial charged-off secured card simultaneously — all disputed, all run through the same reinvestigation process, none substantively corrected. For CAC, the balance

($2,214), open status, and derogatory history were identical before and after dispute. For LVNV, only the balance date refreshed from July 2025 to August 2025; the collection status and amount were unchanged. For Self Financial, the same: the charge-off status and balance were unchanged. The Regional Acceptance tradeline, also charged off at $21,114, remained on the report. In a single reinvestigation cycle, Experian ran four disputed derogatory accounts through its procedures and returned unchanged results on every one of them. That is the ACDV-only, no-escalation, pattern-blind approach the SAC challenges — documented not by inference but by Experian's own dispute results.

## V. EXPERIAN'S WRITTEN ACKNOWLEDGMENT THAT IT RECEIVED AND REVIEWED THE CAC DENIAL LETTER — AND STILL VERIFIED THE TRADELINE — IS INDEPENDENTLY FATAL TO ITS PROCEDURES DEFENSE

Experian's unreasonable procedures claim does not rest on inference or circumstantial evidence. It rests on Experian's own written words.

In response to CFPB Complaint No. 200317-4845361, Experian stated directly in writing: **"We have reviewed and considered the information, including the attachment you have supplied through the CFPB portal and directly to Experian."** That sentence is an admission. Experian received the CAC denial letter — dated February 13, 2019, in which CAC stated it "was unable to locate an account" and "therefore was unable to conduct an investigation" — and Experian's own CFPB response confirms it reviewed that document. Experian then forwarded it to CAC through the ACDV process, received CAC's verification response, and accepted it without question. The August 6, 2020 dispute results letter (Report No. 1734-5729-10)

confirms the outcome: the CAC account was marked "Updated" with no material change — the same balance, the same open and past-due status, the same ongoing delinquency entries.

This sequence eliminates Experian's core defense. The standard ACDV-is-reasonable argument rests on the premise that a CRA is entitled to rely on furnisher verification when it has no reason to doubt the furnisher's response. *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023). Experian had every reason to doubt. Experian held in its own file a letter from the furnisher stating it could not locate the account — a letter Experian confirmed it had read — and accepted that same furnisher's verification that the account was accurate. Both representations cannot simultaneously be true. A furnisher cannot simultaneously be unable to locate an account and able to verify it as accurate. Those positions are mutually exclusive. A reinvestigation procedure that accepts a furnisher's accuracy certification while holding the furnisher's own prior denial of the account's existence, and treats the contradiction as resolved, is not a procedure reasonably designed to assure maximum possible accuracy. It is a procedure designed to close disputes, not to resolve them.

The August 26, 2025 Experian dispute results letter (Report No. 0572-9369-10) makes the inadequacy of Experian's procedures concrete. That reinvestigation — Experian's most recent documented cycle on the CAC tradeline — shows the balance reported as $2,214 as of June 1, 2025, with the most recent payment date frozen at **October 16, 2019** and $0 paid on every line of the balance history going back years. The balance had been incrementally accruing — $2,194 in April 2025, $2,183 in March 2025, $2,173

in February 2025, continuing backward through at least August 2023 — with the last payment date locked at October 16, 2019 on every single entry. That date is not a coincidence. October 16, 2019 is within the same month the vehicle was totaled. The furnisher's own data embedded in Experian's report reflects that no payment activity occurred on this account after the total-loss event — yet the balance continued to grow month after month, reported as an open, past-due obligation. A balance that accrues for years on a debt whose own payment history shows it went dead on October 16, 2019 is not a disputed tradeline — it is a logical impossibility encoded in the furnisher's own data fields. Experian's August 2025 reinvestigation reviewed that data and returned the same result: the account remained listed as "Open. $2,214 past due as of Jun 2025." Nothing substantive changed before or after the dispute. Experian accepted a furnisher verification that required ignoring a balance history showing zero payment activity since the month of the vehicle's total loss.

Experian may argue that its eventual cessation of reporting — sometime after this lawsuit was filed in May 2025 — shows its procedures ultimately worked. That argument fails for the same reason it fails for Equifax: the FCRA's reasonableness inquiry is evaluated at the time of each reinvestigation, not by hindsight. Post hoc correction after years of reporting does not retroactively render prior procedures reasonable. And Experian's timing makes the argument worse, not better — it stopped reporting after being named as a defendant in a federal FCRA lawsuit, not after any new information about the account's accuracy emerged. That is not self-correction. That is litigation-driven removal, which raises its own

inference about what Experian's internal assessment of the tradeline's accuracy had been all along.

**Experian's unreasonable procedures claim is further independently supported by two additional factual allegations that have no counterpart in the TransUnion or Equifax record.** First, Experian's own portal notified Plaintiff that his personal identifying information had been exposed across 29 separate data broker sites and breach events. SAC ¶¶ 73–78. Experian generated those notifications. A CRA that simultaneously alerts a consumer to 29 identity exposure events and continues processing his disputes through automated furnisher verification — without any heightened scrutiny, escalation, or independent review triggered by the identity risk it had itself documented — cannot claim its procedures were reasonably designed to assure maximum possible accuracy on that consumer's file.

Second, in June 2020, while actively reporting disputed derogatory information about Plaintiff to third parties, Experian simultaneously refused to provide Plaintiff with a copy of his own credit report on the ground that it could not verify his identity. The logical contradiction is stark: Experian claimed it could not verify Plaintiff's identity for purposes of giving him his own file, while simultaneously verifying and publishing derogatory information about that same individual to third-party creditors who relied on it in making credit decisions. A CRA that cannot confirm who a consumer is for disclosure purposes but continues to publish harmful information about him to the marketplace is not operating procedures reasonably

designed to assure accuracy — it is operating procedures that protect the CRA's commercial relationships at the consumer's expense.

Taken together — the written admission of document receipt, the accepted contradiction in CAC's own representations, the litigation-triggered removal, the 29 identity exposure events, and the identity-verification refusal — Experian's situation presents a factual record that is not only plausible under *Iqbal* but that no ACDV-is-reasonable case has addressed. The ACDV-adequacy cases involved CRAs that followed standard procedures without specific reason to go further. Experian had written confirmation that something was wrong. It chose not to act on it. Discovery will establish what its internal escalation policies required, what it did with the CAC denial letter internally, and why it accepted a verification that contradicted a document it had in hand. That inquiry cannot happen without discovery.

---

## VI. THE DIVERGENT OUTCOME IS NOT "SPECULATION" — IT IS OBJECTIVE EVIDENCE OF TRANSUNION'S UNIQUE PROCEDURAL FAILURE

The CRA Defendants cite *Allen v. Experian Info. Solutions, Inc.*, 2025 WL 3485873 (D. Idaho Dec. 4, 2025), and a string of cases for the proposition that "differences between the reporting of the three national credit agencies do not evidence an inaccuracy in reporting or unreasonable procedures on any account."

This argument mischaracterizes Plaintiff's position and the cases cited do not address it.

Plaintiff does not argue that CRA reporting differences alone prove inaccuracy. Plaintiff argues that the specific divergent outcome — where two of the three major CRAs ceased reporting the CAC tradeline after

reinvestigation while TransUnion alone continued reporting 68 consecutive months of new delinquencies through active federal litigation — is circumstantial evidence that TransUnion's procedures were uniquely deficient. That argument is meaningfully different from claiming that any reporting difference equals inaccuracy.

The *Allen* line of cases addressed situations where a plaintiff alleged that because CRAs reported different amounts or different statuses, one must be wrong. That is not Plaintiff's argument. Plaintiff's argument is that two CRAs conducted reinvestigations and ultimately concluded that continued reporting was improper, while TransUnion conducted reinvestigations and reached the opposite conclusion — and continued reporting an active delinquency on an obligation allegedly extinguished in 2019 even after a federal complaint was filed and served. The inference that TransUnion's reinvestigation procedures were uniquely deficient is not speculation — it is a plausible reading of an objective, documented divergence in outcome that the CRA Defendants have not explained.

The CRA Defendants' brief offers no explanation for why TransUnion alone persisted through five years of disputes, CFPB complaints, and active federal litigation. The record supports the plausible inference that TransUnion's procedures never identified the error at all. The tradeline was removed on approximately March 18, 2026 — not because TransUnion voluntarily corrected it, but because its projected seven-year statutory reporting window expired. TransUnion's own November 8, 2019 report estimated removal in March 2026. The actual removal occurred in March 2026 — consistent with TransUnion's automated reporting trajectory, which

appears to have proceeded without correction, escalation, or independent review throughout the entire dispute period.

The concrete and quantified consequence of that reporting is now documented. Following the March 18, 2026 removal of the CAC tradeline from Plaintiff's TransUnion file, Plaintiff's Payment History factor — as reflected in TransUnion-linked credit monitoring — moved immediately from 48 ("Needs Work") to 100 ("Excellent"), accompanied by an approximately 15-point increase in Plaintiff's TransUnion credit score. That observed metric change — immediate, contemporaneous, and documented — supports the plausible inference that the CAC tradeline was a primary driver of Plaintiff's suppressed credit profile throughout the reporting period, and that its continued reporting caused ongoing, measurable harm to Plaintiff's creditworthiness.

The broader human consequence is also in the record. Plaintiff's November 8, 2019 TransUnion report listed his oldest account as a JPMCB military charge card opened March 13, 2002 — 17 years of perfect payment history, $0 balance, never a single late payment. That account stopped reporting in 2020. By December 2025, with that clean 17-year account gone, the CAC tradeline had become the oldest account on Plaintiff's Equifax file. A disputed derogatory account — on a vehicle totaled in October 2019, for a debt the furnisher said it could not locate — outlasted a perfect 17-year military charge card and became the anchor of Plaintiff's credit history for years. The plausible inference that this outcome resulted from TransUnion's failure to correct an inaccurate tradeline is supported by the documented record and is sufficient at the pleading stage.

## VII. THE MAGISTRATE DID NOT FULLY ANALYZE THE SAC — HE ANALYZED THE AMENDED COMPLAINT

The CRA Defendants argue that the Magistrate "reviewed hundreds of pages of Plaintiff's exhibits" and concluded that the CRAs "investigated them, and provided the statutorily required responses," and therefore the SAC adds nothing new.

This argument conflates two different documents evaluated against two different standards.

The Magistrate analyzed the Amended Complaint — which contained only bare-bones, conclusory allegations. R&R at 8–9. He supplemented his analysis by reviewing Plaintiff's submitted documents, as permitted for pro se litigants. R&R at 8 n.5. But the Magistrate's conclusion was that the Amended Complaint failed to allege facts supporting the unreasonable procedures element — not that no such facts existed. That is precisely the distinction between a sufficiency finding and a futility finding.

The SAC does not merely restate the Amended Complaint's conclusory allegations. It adds:

- Specific allegations about the CRA Defendants' e-OSCAR/ACDV-only verification practices (SAC ¶¶ 55–62, 69–72, 85–88)

- Specific allegations that those practices did not include escalation protocols, independent review, or any mechanism to evaluate consumer-submitted documentary evidence against furnisher responses

- The TransUnion holdout fact — 68 consecutive months of new delinquencies reported by the lone holdout CRA after two others corrected the record (SAC ¶¶ 35–37, 46–50, 62, 165–167)

• Specific post-litigation conduct: Experian's May 2025 false missed-payment reporting after this case was filed (SAC ¶ 76)

• Experian's concurrent data-exposure notifications and credit-protection product marketing while continuing to verify disputed derogatories (SAC ¶¶ 73–78)

These are not restatements of statutory language. They are factual allegations about specific procedural choices and specific post-litigation conduct that the Magistrate did not analyze because they were not in the Amended Complaint. The SAC cures the deficiency the Magistrate identified.

## VIII. THE PRO SE STANDARD AND RULE 15 STRONGLY FAVOR PERMITTING THE SAC

The CRA Defendants' futility argument — that the SAC cannot state a viable claim — requires the Court to find that Plaintiff's claims fail as a matter of law in a way that cannot be cured through amendment. *Foy v. New York State Unified Court System*, 740 F.Supp.3d 136, 155 (E.D.N.Y. 2024). They have not made that showing.

The SAC contains specific factual allegations about unreasonable procedures, specific post-litigation misconduct, and a documented divergent outcome that raises at least a plausible inference that TransUnion's procedures were uniquely deficient. At the pleading stage, that is all that is required. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Second Circuit "generally disfavors the dismissal of pro se complaints without leave to replead." *Foy*, 740 F.Supp.3d at 155. That principle applies with particular force here, where Plaintiff is proceeding without counsel against three of the largest consumer reporting agencies in

the United States, each represented by separate law firms, and where the core inaccuracy — 68 consecutive months of reported delinquencies on an obligation extinguished in 2019 — has now been independently corroborated by the fact that two of those three CRAs have since ceased reporting the tradeline entirely.

## CONCLUSION

The CRA Defendants' delay argument was rejected by the Magistrate and is unsupported by the record. Their ACDV argument conflates the use of a tool with the existence of a reasonable procedure. Their divergent-outcome argument mischaracterizes Plaintiff's position and cites cases that do not address it. And their futility argument ignores the specific factual allegations the SAC adds that were absent from the Amended Complaint.

Plaintiff does not ask the Court to resolve factual disputes at this stage, but only to permit those disputes to be examined through discovery. Discovery is necessary to determine whether those procedures were reasonably designed to assure maximum possible accuracy, or whether they systematically failed to do so.

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1. Reject the CRA Defendants' argument that leave to amend should be denied as untimely or futile;

2. Permit Plaintiff's Second Amended Complaint to proceed as to Counts I and II against TransUnion, Experian, and Equifax;

3. Allow Plaintiff's FCRA claims against the CRA Defendants to advance to discovery, where the CRA Defendants' internal reinvestigation procedures, escalation policies, and handling of consumer-submitted documentary evidence can be fully established; and

4. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ David D. Adams

**David D. Adams**
Plaintiff, Pro Se
716-435-6420
davidadams2891@yahoo.com
Dated: April 17, 2026

*Plaintiff certifies that artificial intelligence tools were used as an aid in preparing this filing. All factual assertions are based on Plaintiff's personal knowledge and supporting records. Plaintiff has personally reviewed, verified, and approved this filing and remains solely responsible for its contents.*